**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-356 (EGS)** |
| **v.** | : | |
| | : | |
| **KEVIN SAM BLAKELY,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Kevin Sam Blakely to 120 days' incarceration, three years' probation, 60 hours of community service, $500 in restitution, and the mandatory $10 special assessment.

As explained herein, a sentence of 120 days' incarceration with three years' probation is appropriate in Blakely's case because he: (1) entered the grounds of the U.S. Capitol after witnessing the riot taking place, walking over a torn down fence and past police officers wearing riot gear; (2) entered the Capitol Building and went to the Rotunda, where he remained for more than 30 minutes and chanted that he wanted to take the country back; (3) physically interfered with a police officer's exercise of his duties by grabbing the officer's baton; (4) recorded videos of himself and other rioters inside the Rotunda as they resisted the efforts of police officers to remove them; (5) engaged in a "mosh pit," joining with other rioters as they pushed against police officers who attempted to force them out of the Capitol; (6) had to be pepper-sprayed by police officers to force him to leave the Capitol; (7) remained on the grounds of the Capitol, taking pictures of himself and other rioters and encouraging the riot; (8) threatened to return to the Capitol on another day and encouraged others to join him, stating, "All you motherfuckers didn't come . . . get here next time, We gone take our fucking

house back;" (9) after being forced out of the Capitol, Blakely taunted police officers who were blocking access to the Capitol; and (10) all told, Blakely celebrated the riot and was present inside the Capitol and immediately outside the Capitol Building in restricted areas from approximately 2:45 to 4:38 p.m.

Blakely's conduct merits a custodial sentence, even though he did not personally strike any of the officers or destroy any property, and even though he promptly accepted responsibility after charges were brought against him and expressed remorse for his conduct.

## I.  Introduction

Defendant Kevin Sam Blakely, a 56-year old business owner, and a friend traveled together from Texas to Washington, D.C. on January 5, 2021 to attend President Trump's "Stop the Steal" rally. Blakely, his traveling companion, and two other individuals attended the rally at the Ellipse on January 6, and planned to march to the United States Capitol, but made a detour and returned to their hotel rooms at the Hyatt Regency. While at the hotel, Blakely watched Fox News and saw that a crowd was growing at the Capitol; he looked out his hotel's window and also saw a crowd of people gathering outside the Capitol. Between 2:00 and 2:30 p.m., Blakely decided to get closer and more fully experience this "once in a lifetime" event. He then left his hotel room to go to the Capitol to participate in what would be the January 6, 2021 attack on the United States Capitol—the violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' of property damage.

Importantly, the Court must also consider that Blakely's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that

relied on numbers to overwhelm law enforcement officials, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed to disrupt the Electoral College certification vote. Here, Blakely's participation in a riot that actually succeeded in halting the Congressional certification, combined with his verbal protest inside and outside the Capitol Building and failure to comply with police officers' orders for him to leave the Capitol, among other aggravating factors, renders the requested split sentence both necessary and appropriate in this case.

## II.    Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 20 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day.

### Blakely's Role in the January 6, 2021 Attack on the Capitol

Blakely attended the "Stop the Steal" rally held by former President Donald J. Trump at the Ellipse near the White House on January 6, 2021. Afterward, he traveled to his hotel room at the Hyatt Regency and from there watched television coverage of thousands of others gathering on the grounds of the United States Capitol. He decided to join the crowd and walked from his hotel to the Capitol. He admittedly stepped over fencing that the rioters had torn down and walked past police officers in riot gear on the grounds of the Capitol Building.

According to location data regarding his cell phone, Blakely arrived outside the Capitol Building at approximately 2:45 p.m. Surveillance video captured Blakely, depicted in Images 1 and 2, as he entered into the Capitol Building through the Rotunda doors at approximately 2:53

p.m., approximately 16 minutes after the same doors were breached at 2:37 p.m. Blakely is

circled in red in these and in other images.

Image 1



Image 2



Image 3 is a selfie Blakely took that was recovered from his iPhone as he entered into the

Capitol at approximately 2:53 p.m. on January 6.

Image 3



Once inside the Capitol Building, Blakely entered into the Rotunda and remained there from approximately 2:56 until 3:24 p.m. See Images 4 through 6 taken from video captured by surveillance cameras inside the Rotunda.

Images 4-6







Beginning at approximately 2:57 p.m., Blakely recorded the first of many videos that he made of his surroundings and himself in the Rotunda on his iPhone. In the first video he stated, "America's taking their shit back." Video Exhibit 1.

Blakely moved around the Rotunda at will until approximately 3:04 p.m., when police officers began an effort to move Blakely and other rioters out of the Rotunda, as depicted in Image 7. At that time, Blakely recorded a video in which he acknowledged the police officers who were trying to get him to leave the Capitol. Blakely stated, "America, we might be back." See Video Exhibit 2.

Image 7



As the officers tried to organize themselves, Blakely, as captured on another one of his own recordings, taunted the officers, who were exercising restraint, by asking them, "Is that all you got?" He continued, "You got 100,000 outside, so you ain't got enough." Video Exhibit 3.

In a 35 second video recording, when police officers started moving Blakely and other rioters toward the exit, Blakely stated, "Shit's getting real at the Capitol . . . America we did it. . . We comin back and take Congress another day and all these motherfuckers." Video Exhibit 4.

When a Metropolitan Police Department officer attempted to move the rioters, Blakely interfered and grabbed the officer's baton. The officer's Body Worn Camera ("BWC") captured Blakely as he reached for and immediately released the baton. See Image 8. Blakely alleges that he grabbed the officer's baton to prevent the officer from striking a rioter.

Image 8



Surveillance video from the Capitol captured images, including Image 9, that shows police officers' face-to-face confrontation with Blakely as they attempted to force him to leave the Rotunda and the Capitol. In Image 9, a police officer has his hand on Blakely's arm, forcefully attempting to remove him from the Capitol.

Image 9



Additionally, Image 10, obtained from an open source, also reveals police officers' confrontation with Blakely as he was being forced out of the Capitol.

Image 10



At approximately 3:16 p.m., Blakley made a video recording of himself being moved by police officers. Video Exhibit 5. A few minutes later, at approximately 3:20 p.m., he recorded a 23 second video in which he stated, "They just pushed us out of Congress." He continued, "All you motherfuckers didn't come, can't handle shit, bunch of little bitches, get here next time. We gone take our fucking house back." Video Exhibit 6.

At approximately 3:29 p.m., Blakely recorded a video in which he referenced that he had been pepper-sprayed and that the irritant was burning. Video Exhibit 7. And, a minute later, he recorded himself saying, "I'm still here ha ha ha." Video Exhibit 8.

Blakely was eventually forced out of the Capitol by police officers at approximately 3:32 p.m., as shown in Image 11, more than 20 minutes after police officers initially told him to leave the Capitol.

Image 11



Once outside the Capitol, Blakely continued to maintain a presence in the restricted areas of the Capitol grounds. He recorded videos at approximately 4:00 and 4:09 p.m. Video Exhibits 9 and 10. Image 12 is a screenshot taken from Video Exhibit 10 and shows Blakely standing directly in front of police officers who were holding a line to block rioters from entering or re-entering the Capitol. In the recording, Blakely again taunted the officers, stating, "You don't think I'm scared, do you?

Image 12



With the Capitol in the background, Blakely also posed for or was captured in photographs that were posted by others on social media sites. See Images 13 and 14. [The government did not obtain evidence that Blakely posted any photos or videos that captured his perspective on January 6 to any social media sites.] The vehicle that Blakely stood on, as shown in Image 14, potentially belonged to a police officer.

Image 13



Image 14



*The Charges and Plea Agreement*

On March 23, 2021, Blakely was arrested on four misdemeanors via complaint and he was charged by information on May 12, 2021 with one count each of violating: 18 U.S.C. § 1752(a)(1) - Entering and Remaining in a Restricted Building or Grounds (Count One); 18 U.S.C. § 1752(a)(2) - Disorderly and Disruptive Conduct in a Restricted Building or Grounds (Count Two); 40 U.S.C. § 5104(e)(2)(D) – Disorderly Conduct in a Capitol Building or Grounds (Count Three); and 40 U.S.C. § 5104(e)(2)(G) – Parading, Demonstrating or Picketing in a Capitol Building (Count Four).

On October 21, 2021, Blakely pled guilty to Count Four of the information pursuant to a written plea agreement. Also pursuant to the plea agreement, the government agreed to move to dismiss the remaining counts of the information at the time of sentencing and Blakely agreed to pay $500 in restitution to the Architect of the Capitol.

**III.    Statutory Penalties**

Blakely now faces sentencing for Parading, Demonstrating, or Picketing in a Capitol Building,  in violation of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the Probation Office, Blakely faces up to six months' incarceration and a fine of up to $5,000. He must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this case involves a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. § 1B1.9.

**IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a split sentence of 120 days' incarceration, followed by a period of three years' probation.

A.      The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct,  each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and  smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, in determining a fair and just sentence, this Court should assess Blakely's conduct in light of a spectrum of aggravating and mitigating circumstances,  to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

Blakely entered the grounds of the Capitol after viewing crowds around the building on Fox News and from the perspective that he had looking out his hotel room window. He walked over torn down barricades that formerly protected the United States Capitol. He walked past police officers in riot gear who were outnumbered by the crowd forming on the grounds and, by the time that he arrived at the Capitol, had already breached the building.

After entering the Capitol through the Rotunda doors, Blakely began recording his actions, including his chanting, "America's taking their shit back." He remained inside the Rotunda for more than 30 minutes celebrating the riot. Blakely repeatedly asserted that he would return to the Capitol at a later date to continue their assault. For example, in Video Exhibits 4 and 6, Blakely stated, "We comin back and take Congress another day and all these motherfuckers," and "All you motherfuckers didn't come . . . Get here next time we gone take our fucking house back."

Furthermore, during most of the time that Blakley was in the Rotunda, he was either challenging the police officers or resisting their efforts to get him to leave the building. As shown in Video Exhibit 3, Blakely said to police officers, "Is that all you got? . . . "You got 100,000 outside, so you ain't got enough." He and other rioters as a group, which he described in a video as a "mosh pit," pushed back and forth with police officers. See Video Exhibit 5. Even after police officers pepper-sprayed him to motivate him to leave the building, as revealed in Video Exhibit 8, Blakely referenced the irritant, but said, "I'm still here, ha ha ha." An officer grabbed Blakely by the arm and eventually forced him to leave the building.

Accordingly, the nature and circumstances of the offense establishes the clear need for a sentence of incarceration that will adequately punish Blakely for his conduct.

**B.      Blakely's History and Characteristics**

Blakely's conviction in this case was far from his first brush with the criminal justice system. As set forth in the Presentence Report ("PSR"), Blakely has three prior convictions. In 1988, he was convicted for Receiving Stolen Property and he received a suspended jail sentence. PSR ¶ 27. In 2001, he was convicted of driving without a license for which he received a sentence of two years' probation. PSR ¶ 28. Finally, in 2016, Blakely was convicted of driving while intoxicated (count two) and hitting a highway fixture (count one), and was sentenced to 6 days in jail.  PSR ¶ 29.

As also noted in the PSR, Blakely is self-employed as the owner and operator of an automotive dent repair business. PSR ¶¶ 52-53. He also has other business holdings and rental properties. PSR ¶¶ 54-55.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[1] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack

---

[1] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.      The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 24 ("What happened on that day was nothing less than the attempt of a violent mob to prevent the orderly and

peaceful certification of an election as part of the transition of power from one administration to the next, something that has happened with regularity over the history of this country. That mob was trying to overthrow the government.") (statement of Judge Chutkan).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Blakely's conduct and words spoken on January 6 clearly demonstrate the need for specific deterrence in this case. As previously stated, Blakely celebrated the storming of the Capitol and overwhelming the police officers. He ignored officers' efforts to make him and other rioters leave the Capitol and he did not do so until after he was pepper-sprayed and led by the arm by a police officer to the Rotunda doors. After he was forced out of the Capitol, Blakely showed off by recording himself in front of a line of officers who positioned themselves to prevent entry or re-entry to the Capitol and he said, "You don't think I'm scared, do you? Moreover, he referenced returning to the Capitol at a later time to "take our fucking house back."

The government acknowledges that Blakely accepted responsibility early by entering into the plea agreement. However, his actions on January 6 and the threat of future criminal conduct indicates that the Court should impose a sentence that sufficiently deters Blakely from committing a similar crime.

### E.       The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors,  to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[2] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not become the default.[3] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth); *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic

---

[2] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[3]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have drawn meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant's actions in the Capitol contributed to the riot, how long he remained inside the Capitol or in restricted areas inside and outside the Capitol, the nature of nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the

Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the government believes its recommendation for a period of incarceration is in accord with other misdemeanor cases which involve similar aggravating factors – where the government sought and received incarceration sentences – rather than those cases where the government sought home detention or probation. For example, in *United States v. James Bonet,* 21-cr-121 (EGS), a misdemeanor case similar to the subject case, the government requested 45 days incarceration and 12 months' probation. Bonet expressed an intentional desire to forcefully "tak[e] our country back" and called police "pieces of shit" after seeing a rioter fight with police. After he breached the Capitol, he celebrated this accomplishment in many ways. He made a recording in which he declared, "We made it in the

building bitches! We're taking it back, we made it in the building." He also entered Senator

Merkley's office, that had been trashed during the riot, and filming himself smoking a joint

inside that office. He recorded additional videos in the Capitol and left 17 minutes after he had

entered. This Court sentenced Bonet to 90 days' incarceration, 12 months' probation, and 200

hours community service.

Blakely's conduct was significantly more aggravating than Bonet because Blakely

intended to return to the Capitol with more rioters to finish the takeover of the Capitol and he

also personally engaged with police officers. Blakely mocked the officers for being outnumbered

by the mob inside and outside the Capitol. He joined a group of rioters who pushed against a

police line. He ignored police commands to leave the building and had to be physically forced to

leave the Capitol. Moreover, Blakely grabbed a police officer's baton, interfering with the

officer's exercise of his duties. Thus, 120 days' incarceration recommended by the government

is appropriate.

In *United States v. Jeffrey Register,* 21-cr-349 (TJK), another misdemeanor case, the

government requested five months' incarceration and the Court sentenced the defendant to 75

days' incarceration on February 24, 2022. There, the defendant was among the initial crowd that

surged toward the Capitol and overran police barricades. After he entered the Capitol, just five

minutes after the first wave of rioters that breached the building, he blazed a lengthy path

throughout the Capitol, including the Crypt, Statuary Hall, and then near the Speaker's Lobby.

He remained inside the Capitol for approximately 30 minutes and on the Capitol grounds for an

hour past that time.

Register spent far less time in the Capitol than Blakely. But, both Register and Blakely

intended to affect the certification proceeding, as evidenced by Register's admission and the

statements Blakely made while in the Capitol. Most importantly, both Register and Blakely ignored officers' clear attempts to clear them and other rioters from the Capitol. However, Register did not taunt, mock, push against or interfere with police officers, which is what Blakely did and another reason for the sentence that the government recommends in this case.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

**IV.    The Court's Lawful Authority to Impose a Split Sentence**

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense.  *See* 18 U.S.C. § 3561(a)(3); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing a split sentence).

**A. A sentence imposed for a petty offense may include both incarceration and probation.**

*1. Relevant Background*

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today. *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing). That legislation falls in Chapter 227 of Title 18, which covers "Sentences." Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment). Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[4] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences." Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided." 18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[5]

---

[4] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10). *See* Part II *infra*.

[5] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence." 18 U.S.C. § 3551(b).

As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense." H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language. *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report). In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).

### 2. *Analysis*

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases. *See United States v. Cohen*, 617

F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).   In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.  S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).  *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless."  *Little*, 2022 WL

768685, at *4.  But that limitation "does not extend" to a defendant sentenced to a petty offense.  *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation.  *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam).  In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison.  *Id.* at 808.  In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation."  *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense."  *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense").  Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense."  The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated

phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense." *See Little*, 2022 WL 768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific

statute will not be controlled or nullified by a general one."). As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. *Id.* This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented." *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Id.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section

3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence.   Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3).   *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense.   For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough.   *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted).   Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation).   Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation).   No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense.   Comeau pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine.   *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d

1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

**B. A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.**

### 1. *Relevant background*

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation." 18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*[6]

### A. *Analysis*

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time." 18 U.S.C. § 3653(b)(10). Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period"

---

[6] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation." S. Rep. No. 225, 1983 WL 25404, at *98.

of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits.").  Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[7]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation.  18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539.  Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic.  Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure.  In any event, the government does not advocate a sentence that includes a imprisonment as a term of probation in Comeau's case given the requested 20-day imprisonment sentence.

---

[7] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison.  Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular."  1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

V.      **Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Blakely to 120 days' incarceration, followed by three years' probation. He should also be ordered to pay $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY
DC BAR NO. 481052


By:      */s/ ANITA EVE*
ANITA EVE
PA Bar No. 45519
Assistant United States Attorney (Detailee)
U.S. Attorney's Office
555 4th Street, N.W., Room 5840
Washington, D.C.  20530
Anita.eve@usdoj.gov
(215) 764-2177

Exhibit and Attachment List

Videos:

1.    Exhibit 1 – "America's taking their shit back"
2.    Exhibit 2 – "America, we might be back"
3.    Exhibit 3 – "Is that all you got?"
4.    Exhibit 4 – "We comin back and take Congress another day and all these motherfuckers"
5.    Exhibit 5 – Blakely being moved by police
6.    Exhibit 6 – "They just pushed us out of Congress . . . ."America's taking their shit back"
7.    Exhibit 7 – "Pepper-spray is burning"
8.    Exhibit 8 – "I'm still here, ha ha ha"
9.    Exhibit 9 – Blakely on steps of Capitol
10.   Exhibit 10 – Blakely standing in front of police line

   *Note that the 10 videos will be provided via electronic communication to the Court and defense counsel via USAfx. The government reserves the right to supplement this list with additional videos, based on images contained in the government's sentencing memorandum*

   *Note that the government does not object to the public release of any of the above videos.*

Attachments:

1.    Table 1 -Table of sentencing decisions